IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| TRAVIS DUNCAN, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 17-03404-CV-S-BP |
| ) | |
| BLACKBIRD PRODUCTS GROUP, LLC, ) | |
| ) | |
| Defendant. ) | |

## <u>ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Pending is Plaintiff Travis Duncan's motion for partial summary judgment on Defendant Blackbird Products Group, LLC's counterclaims. (Doc. 125.) For the following reasons, the motion is **GRANTED IN PART, DENIED IN PART**, and **DEFERRED IN PART**.

## I.  BACKROUND

This case has been pending since December of 2017. In September of 2019, Blackbird filed its Answer to Duncan's Third Amended Complaint, which advanced a number of counterclaims. (Doc. 88.) On December 13, 2019, Duncan filed a motion for summary judgment on all of Blackbird's counterclaims. (Doc. 125.) Blackbird asked for several extensions of time to respond to Duncan's motion (some of which requests Duncan opposed), and the Court granted Blackbird's requests. (*See* Docs. 128, 137, 146.) The latest deadline to respond to Duncan's motion was July 15, 2020. (Doc. 146.) Blackbird never filed a response.

On November 23, 2020, Duncan filed a second motion for summary judgment; this one pertained to his claim that Blackbird infringed his copyright in six photographs. (Doc. 309.) The parties fully briefed the motion, and on March 3, 2021, the Court granted summary judgment to Duncan on his copyright infringement claim with respect to those six photographs. (Doc. 407.)

The Court now addresses Duncan's original summary judgment motion. At the outset, the

Court reiterates that Blackbird did not respond to the motion. This alone does not entitle Duncan to summary judgment, however. "Summary judgment is appropriate when the *record as a whole* shows that 'there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law.'" *Barnard v. Jackson County*, 43 F.3d at 1218, 1223 (8th Cir. 1995) (quoting FED. R. CIV. P. 56(c)) (emphasis added). Many of Blackbird's arguments in response to Duncan's second motion for summary judgment also relate to its counterclaims, (*see generally* Doc. 338), so the Court will consider Duncan's motion in light of those arguments. But the Court is "not obliged to scour the record looking for factual disputes," *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1033 (8th Cir. 2007), or "locate specific controverting evidence" to Duncan's assertions. *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 970 (8th Cir. 1999.) In sum, the Court will consider the arguments Blackbird has presented, but will not search the exceedingly voluminous record to locate every piece of evidence that Blackbird might have cited to contradict Duncan's interpretation of the facts.

The Court's recent order on Duncan's second motion for summary judgment, (Doc. 407), included a detailed overview of the facts supported by the record. Consequently, the Court will briefly summarize the factual history of this case, but this discussion is meant to supplement, rather than replace, the Court's discussion in (Doc. 407). The Court states these facts in the light most favorable to Blackbird, and will set out additional facts as needed when addressing the parties' arguments.

In early 2017, Duncan exchanged emails and telephone calls with Michael and Renee Hannigan—Blackbird's CEO and vice president of customer relations, respectively—discussing the possibility of Duncan photographing various Blackbird products. The parties eventually reached an arrangement by email under which Duncan agreed to photograph Blackbird products

2

for Blackbird to use in its promotional materials in exchange for payment. Blackbird then sent several of its products (namely, coolers) to Duncan for him to photograph.

For a while, the relationship between Duncan and Blackbird went well; Blackbird provided positive feedback on Duncan's work and used some of Duncan's photographs in its advertising, and Duncan used some of his photographs of Blackbird products as samples to market his services as a photographer. But the relationship soured when Blackbird came to believe that Duncan was not taking the photographs it requested, Duncan's work was sub-par, and Duncan was overcharging Blackbird for the work he performed. Moreover, some of Duncan's photographs incorporated third-party stock images in ways that, Blackbird believed, exceeded Duncan's license for the stock images. Blackbird eventually stopped paying Duncan's invoices and demanded that Duncan return the products it had sent him to photograph. Duncan did not return the coolers, but attempted to pay for them by directing his attorney to send a check to Blackbird; Blackbird rejected the check. Blackbird later began using certain photographs taken by Duncan to advertise its products without paying for those photographs.

Duncan then brought this suit, alleging that Blackbird infringed on his copyrights, violated the Digital Millennium Copyright Act, breached their contract, and was unjustly enriched. (*See generally* Doc. 72.) Blackbird later filed its Answer, (Doc. 88), which denied liability and advanced nine counterclaims:

- Count I seeks a declaratory judgment that Duncan's copyrights are invalid
- Count II seeks a declaratory judgment that Duncan's copyright registration is unenforceable
- Count III asserts that Duncan infringed Blackbird's trademark under 15 U.S.C. § 1114(1)
- Count IV asserts that Duncan infringed Blackbird's trademark under 15 U.S.C. § 1125(a)
- Count V asserts that Duncan breached the parties' contract
- Count VI asserts that Duncan committed fraud by failing to disclose his use of stock images

3

- Count VII asserts that Duncan committed negligent misrepresentation by failing to disclose his use of the stock images
- Count VIII asserts that Duncan committed conversion by failing to return Blackbird's coolers
- Count IX asserts that Duncan was unjustly enriched through its use of Blackbird's trademark

Duncan's motion seeks summary judgment on all of these Counts. The Court addresses these arguments below.

## II. DISCUSSION

"Summary judgment should be granted when—viewing the facts most favorably to the nonmoving party and giving that party the benefit of all reasonable inferences—the record shows that there is no genuine issue of material fact." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) (citing FED. R. CIV. P. 56(c)). "A fact is material if it might affect the outcome of the suit," and a genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (cleaned up; citations omitted). "The party opposing summary judgment cannot rest solely on . . . [m]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions," *Morgan v. A.G. Edwards & Sons*, Inc., 486 F.3d 1034, 1039 (8th Cir. 2007), but must instead point to evidence in the record demonstrating the existence of a factual dispute. FED. R. CIV. P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909–10 (8th Cir. 2010).

With these principles in mind, the Court turns to Duncan's arguments for summary judgment. The Court will address the Counts in Blackbird's counterclaim based on the subject matter to which they relate.

### 1. Validity of Duncan's Copyright (Counts I and II)

The Court has already rejected Blackbird's arguments that Duncan's copyright is invalid or unenforceable in its order granting Duncan's second motion for summary judgment. (*See* Doc.

4

407, pp. 9–12, 18–30.)  As a result, Blackbird is not entitled to a declaratory judgment that Duncan cannot enforce his copyright, and Duncan's motion for summary judgment is **GRANTED** as to Counts I and II.

   **2. Use of Blackbird Trademarks (Counts III, IV, and IX)**

Blackbird has trademarks in the name "MAMMOTH" and the word "Mammoth" written in a stylized way, such that the "a" is represented by a drawing of a wooly mammoth, in connection with insulating sleeve holders for beverage cans, coolers, and reusable ice cubes (the "Trademarks").  (*See* Doc. 88, pp. 42–43 (the trademark registrations).)  Blackbird's Trademarks appear on most of its products and advertising; for example, Blackbird sells coolers, reusable ice cubes, and sleeve holders with "MAMMOTH" written on them.  (Doc. 88, p. 20 (Blackbird's counterclaim); *id.* at p. 44 (photos of Blackbird products with the "MAMMOTH" mark).)

After Duncan began working with Blackbird, he used some of the photos he had taken to advertise his services as a photographer.  Specifically, Duncan (1) used an image he produced of Blackbird's "Ice Bergs," which included the MAMMOTH mark (the "Ice Bergs image"), on two websites: his personal website and his page on the American Society of Media Photographers website; (2) used the Ice Bergs image in an email campaign to his potential clients, and discussed the challenges involved in shooting that photo; and (3) in the same email campaign, referred to Blackbird as "our client Mammoth Coolers," and said Mammoth Coolers was "thrilled" with the Ice Bergs image.  (*See* Doc. 88, pp. 26–27; Doc. 126-8 (the Ice Bergs image and email in which it was used).)

Blackbird asserts three causes of action based on this conduct: trademark infringement under 15 U.S.C. §§ 1114(1), 1125(a) (Counts III and IV), and unjust enrichment (Count IX).  The

5

Court discusses the trademark infringement Counts together, and the unjust enrichment Count separately.

  a. Trademark Infringement

Blackbird alleges that Duncan's use of his pictures of Blackbird products with the "MAMMOTH" mark constitute trademark infringement under two statutory sections. Under 15 U.S.C. § 1114(1), a person is liable for trademark infringement if he "use[s] in commerce any reproduction . . . of a registered mark in connection with the . . . advertising of any [] services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." Under § 1125(a), a person is liable if he "uses in commerce any . . . symbol . . . which [] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."

Thus, both of these statutory provisions require that the alleged infringement created a likelihood of deception, confusion, or mistake. And under both provisions, a likelihood of deception, confusion, or mistake occurs if the alleged infringer's product, due to the alleged infringement, "would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 773 (8th Cir. 1994); *see also Hubbard Feeds, Inc. v. Animal Feed Supp., Inc.*, 182 F.3d 598, 602 (8th Cir. 1999) ("The ultimate inquiry [under § 1125(a)] always is whether, considering all the circumstances, a likelihood exists that consumers will be confused about the source of the allegedly infringing product."); *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987) (a party claiming trademark infringement "must demonstrate that [the infringing use] creates a likelihood of confusion, deception, or mistake on

the part of an appreciable number of ordinary purchasers as to an association between" the alleged infringer and the trademark holder).

Duncan argues that a person who viewed the allegedly infringing use of Blackbird's trademark would not reasonably confuse Duncan's product with Blackbird's. (Doc. 126, p. 26.) The Court agrees. First, there is no evidence that Duncan intended to trick customers into believing that he manufactured MAMMOTH coolers; Duncan's email, his personal website, and the American Society of Media Photographers website all make it very clear that the product Duncan is advertising is his photography services, not the products that appear in the photographs. *See Davis v. Walt Disney Co.,* 430 F.3d 901, 904 (8th Cir. 2005) (absence of intent to confuse was a factor in finding that alleged infringer's use did not create a likelihood of confusion). Second, and relatedly, Duncan and Blackbird operate in entirely different industries: Duncan is a professional photographer, and Blackbird manufactures outdoor consumer products. No reasonable consumer would visit Duncan's website, see the many and varied pictures Duncan has taken, see the text advertising Duncan's services as a photographer, and believe that she could buy a cooler from Duncan. *See Davis*, 430 F.3d at 904 ("If products are 'wholly unrelated' this [] weighs against a finding that confusion is likely.") (quoting *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005)); *see also Brown & Bigelow v. B.b Pen Co.,* 191 F.2d 939, 944 (8th Cir. 1951) ("the fact that the parties were dealing with different classes of trade" was evidence that confusion was unlikely).[1]

---

[1] The Eighth Circuit employs six non-exclusive factors to ascertain whether there is a likelihood of confusion: "1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's and defendant's marks; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers, and 6) evidence of actual confusion." *Davis*, 430 F.3d at 903 (citing *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1990)). Neither party makes any argument about the majority of these factors; the Court has discussed the two factors for which there is ample evidence in the record supporting Duncan's position, and finds that there is no evidence supporting the other factors that would outweigh these two.

In short, the undisputed evidence demonstrates that none of Duncan's uses of Blackbird's Trademarks are likely to cause confusion, deception, or mistake among any appreciable group of Blackbird's potential customers.[2] As a result, Duncan's motion for summary judgment is **GRANTED** as to Counts III and IV.

      b. Unjust Enrichment

Blackbird also alleges that Duncan was unjustly enriched by his use of photographs of Blackbird products to advertise his services as a photographer. To prove unjust enrichment, a plaintiff must establish that "(1) he conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010). As to the third element, which Missouri courts regard as the "most significant," a key factor in ascertaining the "injustice" of Plaintiff's retention of the benefit is "whether any wrongful conduct by the defendant contributed to plaintiff's disadvantage." *Graves v. Berkowitz*, 15 S.W.3d 59, 61 (Mo. Ct. App. 2000).

Duncan contends that there is no evidence that he engaged in any kind of wrongful conduct, or any other circumstances that make his use of his work for Blackbird "unjust." (Doc. 126, p. 28.) The Court agrees. There was no agreement between the parties that Duncan could not use the pictures he took of Blackbird products to showcase his work or advertise his services.[3] There is no evidence that Duncan took any sort of benefit from Blackbird at all. It is common for artists

---

[2] To the extent that Blackbird believes Duncan created a likelihood of confusion by representing that Mammoth Coolers was one of Duncan's clients, the Court disagrees: even if such a representation could qualify as trademark infringement, Blackbird (D/B/A Mammoth) *was* one of Duncan's clients, which is why this whole case arose. "Confusion" implies a mistaken belief; if a potential customer believed that Duncan had worked for Mammoth Coolers, that belief would not be mistaken.

[3] Although Hannigan testified that Duncan promised that Blackbird would "own all its images," what he meant was that Blackbird would have "full unlimited use" of the images. (Doc. 309-3, p. 5 (Hannigan Dep., pp. 14–17).) The notion that Blackbird would have the right to use those images exclusive of Duncan does not appear in the parties' agreements. *See* Section II.3, *infra*.

8

to use work commissioned by clients as part of a portfolio to attract other clients. Absent some kind of contractual obligation to the contrary, or some kind of deception on Duncan's part, there is nothing "unjust" about such a practice. For this reason, Duncan's motion for summary judgment is **GRANTED** as to Count IX.

### 3. Breach of Contract (Count V)

As the Court explained in its previous order, Duncan and Blackbird negotiated their agreement through emails and phone calls. Generally, the parties agreed that Duncan would photograph Blackbird products, and Blackbird would pay Duncan for the license to use those photographs in its website and advertising. In Count V of its counterclaim, and in its opposition to Duncan's second motion for summary judgment, Blackbird advances a number of theories as to how Duncan breached their agreement; for instance, it contends that Duncan breached his agreement in an email to "back all of [his] productions with a full 100% money back guarantee," in that Blackbird was not satisfied with his work, but Duncan refused to refund the money it paid, (Doc. 341-1, p. 28 (email, Bates number 021719)), and that Duncan failed to return some of the coolers Blackbird sent him to photograph despite agreeing to do so. (*See generally* Section II.5, *infra*; *see also* Doc. 341-1, pp. 102–03 (Renee Hannigan agrees to let Duncan have "a couple items for personal use" but otherwise expects the Blackbird products to be returned).)

Duncan's motion focuses on only one of these theories, however. This theory is that Duncan "had a duty, pursuant to the parties' agreement . . . to convey the entire ownership of [his] work, *including copyright*, to Blackbird." (Doc. 88, p. 33.) Duncan argues that there is no evidence in the record to support Blackbird's claim that Duncan had a duty to convey the copyright to his images to Blackbird—rather, Duncan contends the agreement required him to issue a *license* to Blackbird, which he did regarding all the images for which Blackbird paid. (Doc. 126, p. 29.)

9

The Court agrees with Duncan. The parties' communications discuss Duncan issuing a license to allow Blackbird to use his photographs in its advertising. (*See* Doc. 341-1, p. 28 (email, Bates number 021719) (Duncan promises to "issue a license that gives [Blackbird] the legal right to use the images in advertising . . .").) In its opposition to Duncan's second motion for summary judgment, Blackbird points to a line from Hannigan's deposition asserting that "Duncan shook Hannigan's hand and confirmed that fact [sic] Blackbird would *own* all its images." (Doc. 309-3, p. 5 (Hannigan Dep., p. 17) (emphasis added).) But a few lines previously, Hannigan states that "I don't think I could ever get the copyright for an image that another photographer had made. All I could achieve was full ownership and unlimited use of that image . . ." (*Id.*) Thus, in context, it is clear that when Hannigan discussed "*own*[ing]" Duncan's images, he was referring to the ability to use the images freely, not gaining possession of the copyright. Consequently, there is no evidence indicating that Duncan had an obligation to transfer his copyrights to Blackbird, so Duncan's motion for summary judgment is **GRANTED** with respect to this theory.[4]

### 4. Misrepresentation (Counts VI and VII)

Some of the photographs Duncan prepared for Blackbird included stock images. For instance, one photo, labeled "Icebergs Dropbox," depicts Blackbird-manufactured reusable ice cubes falling into a cup filled with some sort of liquid, thereby causing the liquid to splash. (Doc. 375-33 (the "Icebergs Dropbox" image).) The "splashing" liquid is actually a stock photograph from Shutterstock digitally superimposed on the cup Duncan photographed. (Doc. 304-9, p. 98 (Duncan first Dep., p. 98).) In total, Duncan appears to have used four Shutterstock images in editing the photographs he took for Blackbird. (Doc. 375-38 (the stock images Duncan used).)[5]

---

[4] Blackbird remains free to assert that Duncan breached the parties' agreement in any other way asserted in its Answer and Counterclaim.

[5] In other words, Blackbird's claims about Duncan's Shutterstock license relate to a small fraction of the hundreds of pictures Duncan took of Blackbird products.

10

Duncan had a "Standard Image License" with Shutterstock. (Doc. 309-4, p. 100 (Duncan first Dep., p. 100).) The Standard License allows licensees to use Shutterstock images:

1. "As a digital reproduction, including on websites, in online advertising, [and] in social media . . . .";

2. "Printed in physical form as part of product packaging and labeling . . . .";

3. "As part of an 'Out-of-Home' advertising campaign, provided the intended audience for such campaign is less than 500,000 gross impressions.";

4. "Incorporated into film, video, television series, advertisement, or other multimedia productions . . . provided the budget for any such Production does not exceed USD $10,000."; and

5. "For [the licensee's] own personal, non-commercial use . . . ."

(Doc. 31-1, pp. 3–4 (the License).) The License is "non-transferable," meaning that licensees "may not . . . transfer to anyone, [Shutterstock] Visual Content or the right to use Visual Content." (*Id.* at pp. 3, 6.) But a licensee may "make a one-time transfer of Visual Content to a third party for the sole purpose of causing such third party to print and/or manufacture your good incorporating Visual Content subject to the terms and conditions herein." (*Id.*) The license also refers to using "Visual Content as part of work product created for or delivered to a client or customer," but does not further explain the limits on using Shutterstock imagery as part of such work product. (*Id.*)

Blackbird contends that Duncan's incorporation of Shutterstock images in photographs that were given to Blackbird for use in its advertising exceeded the terms of Duncan's Shutterstock license. (Doc. 88, pp. 33–39.) Specifically, Counts VI and VII of Blackbird's counterclaim allege that Duncan falsely represented that he could transfer a full license to his photographs to Blackbird, and that Blackbird was harmed by this representation because it paid for photographs it could not freely use in its advertising; Count VI claims that Duncan's misrepresentation was fraudulent, and Count VII claims that it was negligent. (*Id.*) Under Missouri law,

11

> The elements of a fraudulent misrepresentation claim are: (1) a false, material representation, (2) the speaker's knowledge of its falsity or his ignorance of its truth, (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated, (4) the hearer's reasonable reliance on its truth, and (5) the hearer's consequent and proximately caused injury. The elements of a negligent misrepresentation claim are similar. . . . There are only two differences between a fraudulent and negligent misrepresentation. First, fraudulent misrepresentation requires that the person knowingly or recklessly supply false information, whereas negligent misrepresentation requires no such knowledge or recklessness. Second, negligent misrepresentation requires that the information be supplied in the course of the defendant's business.

*Kesselring v. St. Louis Group*, 74 S.W.3d 809, 813 (Mo. Ct. App. 2002) (citations omitted).

Because a false representation is an element of both fraudulent and negligent misrepresentation, an initial question common to both Counts is whether Duncan's transfer of photographs incorporating Shutterstock images—or Blackbird's anticipated use of those photographs as part of its advertising—actually violated the terms of the Standard License. If not, then Duncan would not have falsely represented anything. Unfortunately, the Standard License itself is extremely unhelpful: it *implies* that a licensee may use Shutterstock images in creating work product for clients or other third-parties (which appears to contradict the general "non-transferab[ility]" of the license), but does not explain the limits on that use. (*See* Doc. 126-6, p. 6.) The parties deposed Ms. Sejal Patel Richbourg, an assistant general counsel of Intellectual Property and Litigation at Shutterstock, (Doc. 375-11), but she was unable to provide much insight on how the Standard License might apply in this case. (*Id*. at p. 11 (Richbourg Dep., p. 11) ("I cannot provide a license interpretation.").) Richbourg did, however, indicate that a licensee's breach of the License could cause Shutterstock to terminate the License. (*Id*. at p. 17 (Richbourg Dep., p. 17).)

Duncan's motion for summary judgment discusses only the enumerated permitted uses discussed in the License. He contends that because the License "permits use [of Shutterstock images] for commercial purposes," such as "a digital reproduction, including on websites [and]

12

online advertising," "the Shutterstock license specifically allows for Blackbird's intended use." (Doc. 126, pp. 32–33.) But this does not answer the question, because while the License may allow the *licensee* to use Shutterstock images for certain commercial purposes, it does not clarify whether and when a *third-party* to whom the licensee transfers photographs incorporating Shutterstock images may use those photographs. Thus, the Court finds that a dispute remains as to whether Duncan truthfully represented that Blackbird could use all of the photographs he prepared in its advertising without violating the Shutterstock license.

However, the Court believes that interpreting the Shutterstock license is an issue that should be resolved before trial if possible. Therefore, within fourteen days, Duncan may file a supplemental brief on the *narrow issue* of whether Blackbird's anticipated use of Duncan's photographs would have exceeded Duncan's Shutterstock license. Blackbird may then file a response within fourteen days after Duncan files his brief. No reply brief will be permitted. If Duncan chooses to avail himself of this option, the parties are directed to confine their briefs to 20 pages or fewer (including facts) with 5 or fewer exhibits, and to limit their arguments to interpreting the Shutterstock license. Motions to expand the page limit or extend the time to file these supplemental briefs will not be considered.

The Court now turns to Duncan's other arguments as to why he is entitled to summary judgment on each of Blackbird's counterclaims pertaining to the Shutterstock license.

a. Fraudulent Misrepresentation

Count VI of Blackbird's counterclaim alleges that Duncan committed fraudulent misrepresentation by failing to disclose the alleged limits on his ability to use Shutterstock images in his work product. (Doc. 88, pp. 33–36.) An essential element of fraudulent misrepresentation under Missouri law is "the speaker's knowledge of [the misrepresentation's] falsity." *Droz v.*

13

*Trump*, 965 S.W.2d 436, 441 (Mo. Ct. App. 1998).  The Court has already held that there is no evidence Duncan was aware of any restrictions on his ability to use Shutterstock photos in his work for Blackbird, (*see* Doc. 407, pp. 28–29), meaning that there is also no genuine dispute of material fact as to this element of Blackbird's fraud claim.  Thus, Duncan's motion for summary judgment is **GRANTED** as to Count VI.

    b. Negligent Misrepresentation

Count VII of Blackbird's counterclaim alleges that Duncan committed negligent misrepresentation by failing to disclose the alleged limits on his ability to use Shutterstock images in his work product.  (Doc. 88, pp. 36–39.)  Duncan claims that Blackbird has not shown a dispute of material fact as to whether Duncan's representation was false, whether the alleged falsehood resulted from Duncan's lack of reasonable care, and whether Blackbird suffered a pecuniary loss as a result of the representation.  (Doc. 126, pp. 33–34.)

As the Court discussed above, it is unclear whether Duncan's representation that Blackbird could use his photographs in its advertising was false in light of the uncertainty about the meaning of the Shutterstock license.  If Duncan's representation *was* false, the Court believes a jury could find that Duncan failed to exercise reasonable care in ascertaining the limits on his Shutterstock license.  At his deposition, Duncan initially could not identify the source of the stock photo he used, and later admitted that he "do[esn't] know what the license says" about his right to distribute that photo.  (Doc. 309-4, pp. 98–99 (Duncan First Dep., pp. 98–99).)  A jury could reasonably conclude that Duncan should have known, at least generally, the terms of the license he obtained on the stock photos he used.

As to the pecuniary loss element, Duncan says merely that "Blackbird does not allege with any specificity that [] Blackbird's reliance on the information resulted in pecuniary loss."  (Doc.

126, p. 34.) But if Blackbird's theory is true, Blackbird paid money for photographs with the expectation that it could use those photographs in its advertising, and later found that it could not use them in that fashion. This means that Blackbird would have lost, at the very least, the money it paid for the photographs—which is a pecuniary loss.

Thus, the Court's determination of whether there is a dispute of material fact on Blackbird's misrepresentation claim depends on whether Blackbird's anticipated use of Duncan's photographs would have violated the Shutterstock license. The Court therefore **DEFERS** ruling on Duncan's motion for summary judgment as to Count VII.

   **5. Conversion (Count VIII)**

As discussed above, in the course of photographing Blackbird products, Blackbird sent Duncan some coolers, and Duncan kept those coolers after photographing them. (*See, e.g.,* Doc. 126-9, p. 2 (Hannigan Dep., p. 38) ("[I]n our eyes we had left him over $2,000 worth of product that he neglected to return.").) Viewing the record in the light most favorable to Blackbird, Blackbird attempted to contact Duncan several times to ask him to return to the coolers, offering to send shipping documents and pay shipping costs, and Duncan "would not reply." (*Id.* (Hannigan Dep., pp. 38–39).) At some later point, Duncan gave all of the coolers to his attorney Robert Schultz. (Duncan Dep., pp. 190–91).) On October 14, 2019, Schultz sent a check for $2,354.67 to Blackbird as payment for the coolers. (Doc. 126-10.) Blackbird did not cash the check, despite its officers knowing that it was intended to pay for the products Duncan kept, because "Rob Schultz never bought any product." (Doc. 372-4, p. 77 (Ryan Jehle Dep., p. 77).) When asked to explain why that would "preclude [Schultz] from paying for the product," Blackbird Chief Operating Officer Ryan Jehle simply said "[w]e made the decision not to cash that check." (*Id.*)

15

Blackbird claims that Duncan committed conversion by keeping its coolers. Under Missouri law, "[c]onversion may be proved in one of three ways: (1) by showing a tortious taking, (2) a use or appropriation by the defendant indicating a claim or right in opposition to the owner, or (3) a refusal to give up possession on demand." *Kennedy v. Fournie*, 898 S.W.2d 672, 678 (Mo. Ct. App. 1995). Blackbird is evidently relying on the third of these theories: it asserts that Duncan was authorized to possess the coolers to photograph them, but wrongfully refused to return the coolers after Blackbird asked him to do so. To succeed on a "failure to return" theory of conversion, Blackbird must prove that it "demanded" that Duncan return the property, and that Duncan "refused" to do so. *Id.*

Duncan does not contest that Blackbird demanded that he return the coolers and he refused to do so. Instead, Duncan argues that because he sent a check for the cost of the coolers, he is entitled to summary judgment on this Count. (Doc. 126, pp. 34–35.) The Court disagrees. Duncan cites no Missouri cases indicating that an offer to pay is a defense to conversion, and the Court is not aware of any. A conversion occurs if a party is wrongfully deprived of its property, even if the party later receives the property or full compensation; "however temporary the conversion may have been, it will suffice to render the defendant[] liable, for a conversion which has once taken place cannot be cured." *Sparks v. Purdy*, 11 Mo. 219, 223 (Mo. 1847). *See also United States v. Victory Highway Vill.*, 662 F.2d 488, 497 (8th Cir. 1981) (injured parties have "no obligation to accept or even consider" a tortfeasor's "proposed settlement offer").

Blackbird has supplied evidence to create a genuine dispute of material fact as to whether Duncan committed conversion on its coolers; thus, Duncan's motion for summary judgment is **DENIED** as to Count VIII.[6]

---

[6] Nonetheless, the Court is perplexed by Blackbird's refusal to accept Duncan's proffered payment. Blackbird is not suing *in replevin*, meaning it is asking for money rather than an order directing Duncan to return the coolers. (*See*

16

## III. CONCLUSION

For the foregoing reasons, Duncan's motion for partial summary judgment, (Doc. 125), is **GRANTED IN PART**, **DENIED IN PART**, and **DEFERRED IN PART**.

**IT IS SO ORDERED.**

                         /s/ Beth Phillips
                         BETH PHILLIPS, CHIEF JUDGE
DATE: March 15, 2021          UNITED STATES DISTRICT COURT

---

Doc. 88, p. 39.) Thus, if Blackbird wins on this Count, it will receive damages in the amount of $ 2,354.67—which is the exact amount Duncan offered to pay. And Blackbird's CEO Michael Hannigan has expressed that he would *prefer* cash to the return of the coolers "since they've been from Travis to [Schultz's] personal house and probably used." (Doc. 126-9, p. 3 (Hannigan Dep., p. 52).) But the Court must decide whether there is a dispute of material fact as to Blackbird's conversion claim, not whether maintaining that claim is a prudent course.